# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### July 19, 2005 Session

## STATE OF TENNESSEE v. DAVID M. OLVERA

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2003-A-390     Cheryl Blackburn, Judge**

---

**No. M2004-02090-CCA-R3-CD - Filed December 2, 2005**

---

The defendant, David M. Olvera, was convicted of first degree felony murder and especially aggravated robbery and sentenced to concurrent terms of life and twenty years, respectively.   On appeal, he argues:  (1) the evidence is insufficient to sustain his convictions; (2) the trial court erred in denying his motion to suppress his statement to police; (3) the trial court erred in allowing an intern from the district attorney general's office to participate in reading the defendant's statement to the jury; and (4) the trial court erred in charging the jury on flight.  Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROBERT W. WEDEMEYER, JJ., joined.

David G. Hirshberg, Nashville, Tennessee, for the appellant, David M. Olvera.

Paul G. Summers, Attorney General and Reporter; Elizabeth T. Ryan, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Bret T. Gunn and Robert E. McGuire, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### FACTS

Gladis Bastista Garcia, testifying through an interpreter, said that she had been married to the victim, Nemesio Silva, for ten years and the victim had lived in the United States for one year before he was killed.  She denied knowing the defendant or the codefendant, Carlos Serrano.

Igmnicio Cruz Martinez, also testifying through an interpreter, said that he and the victim lived in the same apartment complex on Murfreesboro Road in Nashville and that the victim had purchased an automobile one month before he was killed.

Officer Garry J. James of the Metro Police Department testified that he was called to the crime scene off Culbertson Road on August 26, 2002, where he found the victim's body at the bottom of an embankment next to a creek. Officer James observed a bloody rock at the top of the hill directly above the victim's body, as well as several liquor bottles. He said the area where the victim's body was found was about three-quarters of a mile east of Nolensville Road.

Jorge Pastrana Hernandez, testifying through an interpreter, said that the defendant had lived with him and had introduced the codefendant, Carlos Serrano, to him. He said that on Sunday night, the defendant, Serrano, and Mario Ramirez were drinking at his apartment and subsequently left in the defendant's Mitsubishi Mirage automobile. Hernandez did not know what time the three men had returned, but they were at his apartment when he left for work the next morning around 6:40 or 7:00 a.m. and were still there when he arrived home from work that afternoon. He later saw Serrano cleaning out a red Nissan Pathfinder and throwing something into a garbage dumpster. Serrano subsequently left the apartment in the Pathfinder, followed by the defendant and Ramirez in the defendant's car. When the defendant left, he took all of his belongings with him.

Yonas Altimimi, the owner of Lafayette Motors, testified that the defendant bought a Mitsubishi Mirage automobile from him in 2002 and in late August 2002, the defendant and two other men brought a Nissan Pathfinder to him to see if he would be interested in buying it. Of the three men, the defendant was the only one who spoke English. The defendant told him that Serrano wanted to sell the vehicle because he needed funds to go to Mexico. The men had a title to the vehicle, and Altimimi purchased it for $450. About two days later, the police confiscated the vehicle and title. Altimimi identified a photograph of Serrano as the man who sold him the Nissan Pathfinder and acknowledged that the name on the title did not match any of the three men who brought the vehicle to him.

Kurt Walter Bartlett, a crime scene investigator for the Metro Police Department, testified that the crime scene appeared to be "a hangout for the locals where they would go and drink, maybe by the side of the creek, throw bottles into the creek." He said there was "quite a bit of debris" in the area which hampered his collection of the evidence. He said the victim was "covered in blood" and had "some distortion to his face because he had been laying [sic] there for quite a while." He took photographs of a rock that was covered in blood and made a diagram of the crime scene. He subsequently processed the Nissan Pathfinder and found latent fingerprints around the door, the hood area, and the rearview mirror.

Officer Thomas Simpkins of the Metro Police Department testified that he processed the evidence collected by Officer Bartlett, including a Boone's Farm bottle, on which he found some latent fingerprints, and a broken Chevas Regal bottle on which he noticed possible blood spots and two hairs.

Linda Wilson, a police identification analyst with the Metro Police Department, testified that she received the latent fingerprint lifts from Officers Bartlett and Simpkins and determined that prints from the driver's door of the vehicle matched Carlos Serrano.

Dr. Amy McMaster testified that she observed part of the autopsy performed on the victim by Dr. Thomas Deering. She said the victim had sustained multiple lacerations, contusions, and abrasions "all about the head and neck." In addition, he had several fractures of the upper and lower jaw which were comminuted, meaning that the bone was broken into many pieces, indicating "a very strong impact or a strong trauma." The victim also had a fracture along the base of the skull, which indicated blunt trauma to the skull; a large purple contusion on the left side of the face; and multiple small abrasions to the chest, abdomen, and legs. Asked which was the fatal injury, Dr. McMaster opined that it could have been the injury to the skull, which resulted in injury to the brain, or the fractures to the hyoid bone in the neck. She said both of these injuries were caused by blunt force trauma and were consistent with blows "from something hard like a bottle or a rock." The victim's toxicology report revealed .238% ethanol in his blood.

Detective Derry Baltimore of the Metro Police Department Murder Squad Unit testified that he interviewed the defendant on September 3, 2002, through Detective Marvin Rivera who spoke Spanish. The defendant came to the police station voluntarily and was not under arrest. The interview was videotaped, and the tape was admitted into evidence with a small portion of it being played for the jury. The interview was subsequently transcribed in English, and both parties stipulated as to the accuracy of the transcript. Detective Baltimore, along with Detective Rivera and Harold Donnelly from the district attorney general's office, then read the transcript into evidence.

During his interview, the defendant said that he, Serrano, and Ramirez left Franklin on a Sunday and drove to the Executive House Apartments in Nashville, arriving around 10:00 p.m. The defendant waited in the car while Serrano and Ramirez went to look for someone. When Serrano and Ramirez returned, the victim approached and asked Serrano if he would take him to buy some beer because he did not know how to drive a standard shift automobile. Serrano then left with the victim in the victim's vehicle, and Ramirez got in the defendant's car. When the victim and Serrano returned, Serrano got in the car with the defendant and Ramirez and told Ramirez that he had seen the title to the victim's vehicle. Ramirez then said, "Let's rob him" and asked the defendant if he wanted to participate. The defendant initially said "no," but, after much nagging and chastising, Ramirez convinced the defendant to participate in the robbery. Serrano and Ramirez got out of the defendant's car and invited the victim to drink with them in the car. The four men then left the apartment complex and drove to Nolensville Road where they stopped at a gas station to purchase beer. They later stopped on Overton Road where Serrano, Ramirez, and the victim got out to urinate while the defendant remained in the car. The defendant then saw Ramirez hit the victim in the head several times with a "big bottle." The defendant got out of the car and told Ramirez to stop hitting the victim, but Ramirez refused. Serrano also told Ramirez not to hit the victim any more, saying, "[Y]ou're going to kill him." Ramirez then said he was going to "shove" the victim into the river and proceeded to push the victim down the embankment. Not wanting to get involved, the defendant returned to his car. Serrano and Ramirez subsequently walked up from the river bank, and the defendant drove them to the Executive House Apartments where the victim's vehicle was located. All three men then returned to Franklin, with Serrano driving the victim's vehicle and Ramirez and the defendant traveling in the defendant's car. After selling the victim's vehicle to a dealership for $450, they went to Pennsylvania.

Heather Aguirre testified that, in 2002, the defendant and Serrano lived with her at the Heritage Place Apartments in Franklin. During that time, the defendant worked long hours six to seven days a week. She rarely saw the defendant drink alcohol, but Serrano drank "a lot" and "always wanted to go out and party." She had seen Ramirez on two occasions.

Aguirre said the defendant, Serrano, and Ramirez came to her apartment on the morning of August 26, 2002, and she saw a Nissan Pathfinder parked in front of the apartment. Serrano told her he had bought the Pathfinder, showed her the registration, and claimed ownership. She said the defendant told her good-bye and to take care of her children, and the three men then left for Pennsylvania. Subsequently, she talked to the defendant by telephone and convinced him to return to Franklin because the police wanted to question him.

The twenty-one-year-old defendant testified that he was a native of Mexico and had been living in the United States for about four years. He said he had a third grade education and had worked as a painter. The defendant said when he arrived home from work around 5:00 or 6:00 p.m. on August 25, 2002, Serrano and Ramirez were there drinking tequila. At their request, the defendant drove Serrano and Ramirez to Nashville "to look for a friend at the Executive [House Apartments] so they could drink beer." Serrano and Ramirez could not locate their friend, but Serrano talked to the victim and then drove the victim to a gas station to buy beer because the victim did not know how to drive a standard shift car. When Serrano and the victim returned, Serrano told the defendant and Ramirez they should steal the victim's vehicle because he had seen the title to it. Ramirez agreed, but the defendant told them he did not want to participate. Ramirez and Serrano told the defendant that he "wasn't acting like a Mexican," and Ramirez told him if he did not participate, he would be the one they attacked. The defendant said he felt threatened because Ramirez was sitting in the front seat of his vehicle with a bottle of tequila in his hand. Serrano then located the victim, who was drunk, and persuaded him to get in the car with them to go "drinking" and "looking for women." The four men then left the apartment complex, with the defendant driving. After stopping at a gas station to purchase beer, they continued driving and did not stop again until Ramirez told the defendant he needed to urinate. Ramirez, Serrano, and the victim then got out, and Ramirez ordered the defendant out of the car. While the victim was urinating, Ramirez came up behind him and "hit him at the nape of the neck with a bottle of the tequila" several times. When Serrano saw the victim on the ground, he "started to kick him in the ribs." The defendant described what happened next:

> I walked toward my car when [Ramirez and Serrano] each grabbed [the victim], each one with one leg and one hand and pushed him down an embankment. And I got into my car but I was shaking. I didn't know what to do. I kept stepping on the gas and stepping on it and the car was on, it was running. And I tried to get it to move but it wouldn't move.
>
> . . . .

-4-

I saw how they hit him and I saw how they were kicking [the vicitm] and I thought that I was going to be the next.

The defendant said Ramirez and Serrano then jumped in the car, and Ramirez told the defendant, "[Y]ou were trying to leave us, weren't you[?] . . . [L]et me make this clear to you, you shit head, this was no game." The three men returned to the Executive House Apartments where Serrano got in the victim's vehicle and then drove it to the apartment in Franklin. The defendant and Ramirez drove to the Franklin apartment in the defendant's car. The next day, the three men went to Altimimi's dealership and sold the vehicle for $450, with Serrano receiving the money. The defendant acknowledged that he was the one who spoke to Altimimi because Ramirez and Serrano could not speak English. The defendant said that Ramirez later took the money from Serrano and that he did not receive any of the money.

After they left the dealership, Ramirez told Serrano and the defendant that he could get them jobs in Pennsylvania. When the defendant said he "wasn't going anywhere because . . . [he] hadn't done anything," Ramirez told him that all three of them "were involved in this and that . . . if he got put in the jail that [the defendant] was going in too. And that if not, then he would find [the defendant] and he would hurt [the defendant]." The three men later drove to Pennsylvania in the defendant's car, and, en route, Serrano and Ramirez told the defendant "about how they had beaten [the victim]. They were just kidding around about it."

After staying in Pennsylvania for about a week, Ramirez left for Mexico and the defendant called Heather Aguirre to explain "what was going on." Aguirre told him that detectives wanted to speak to him. The defendant and Serrano subsequently drove back to Franklin, during which time Serrano told the defendant to be "very careful" about what he told the police and "to not say that [Serrano] . . . had picked [the victim] up . . . and thrown him." Serrano also told the defendant not to tell "about the way that [Ramirez and Serrano] had treated [him] because if [Serrano] were to be put in jail, he was going to make sure that [the defendant] got put in jail too. And that if they didn't catch [the defendant] then Ramirez had already told [the defendant] what they were going to do to [him]." The defendant said he took Serrano's threats seriously because he had seen "with [his] own eyes how they kicked [the victim]."

The defendant then read into evidence a two-page, bloodstained letter[1] which he received from Serrano after they were incarcerated:

I know that you didn't say anything. You're the only one that knows what I did and if you say something, I'm going to kill you as I do with the other one – as I did with the other dude on the street. I'm going to cut your throat one side to the other. Keep your mouth shut and accept whatever comes.

---

[1]The letter was written in Spanish but was translated by the court interpreter. Both parties stipulated as to the accuracy of the translation.

. . . .

It's blood inside and blood outside . . . if you say something about what I did about what happened, you're a dead man. You're living here with me and you know what could happen if you tell the truth about what I did. I'm going to make sure that you never wake up. . . .

On cross-examination, the defendant maintained that he had no choice but to participate in the robbery of the victim because Ramirez and Serrano were in his car, "[o]ne of them beside me, one of them behind me giving me orders, turn here, turn there." He acknowledged that when he gave his statement he did not tell the police that he had been coerced by Ramirez because he was "very nervous" and thought he "would be the next one they would kill." The defendant said that he went to Florida after Serrano was arrested and that he was living in Ohio at the time of his arrest.

Sergeant Johnny L. Hunter of the Metro Police Department, who was accepted by the trial court as an expert in handwriting analysis, identified a letter written in Spanish that he received for handwriting comparison with the defendant's and Serrano's handwriting samples. He was also asked to perform a blood test to determine if the red substance on the letter was indeed blood. Sergeant Hunter opined that the letter was written by Serrano and said that the red substance tested positive for blood.

Mainor Patricio Salas, testifying through an interpreter, said that he was currently incarcerated for aggravated robbery and had met the defendant and Serrano in prison. He said Serrano had confessed to him "what they had done." He said that although Serrano had not given him a name, he told him "they had stolen a car and they had killed the owner of the car." Serrano told him that Ramirez had hit the victim on the head with a bottle and that Serrano had kicked the victim when he fell to the ground. Serrano also told him that the defendant "was on the other side" and did not do anything to the victim.

At the conclusion of the trial, the jury found the defendant guilty of first degree felony murder and especially aggravated robbery. The trial court denied the defendant's motion for new trial, and the defendant filed a timely appeal to this court.

## ANALYSIS

### I. Sufficiency of the Evidence

The defendant argues that the evidence is insufficient to support his convictions, saying that he "was operating under duress" at the time the offenses were committed. Specifically, he argues that "[i]t was a miscarriage of justice for the jury not to have accorded the defense theory of duress greater weight, as it more than made up for any evidence presented by the State about [the defendant's] minimal involvement."

-6-

In considering this issue, we apply the familiar rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Duress is defined as follows:

> (a) Duress is a defense to prosecution where the person or a third person is threatened with harm which is present, imminent, impending and of such a nature to induce a well-grounded apprehension of death or serious bodily injury if the act is not done. The threatened harm must be continuous throughout the time the act is being committed, and must be one from which the person cannot withdraw in safety. Further, the desirability and urgency of avoiding the harm must clearly outweigh, according to ordinary standards of reasonableness, the harm sought to be prevented by the law proscribing the conduct.

> (b) This defense is unavailable to a person who intentionally, knowingly, or recklessly becomes involved in a situation in which it was probable that the person would be subjected to compulsion.

Tenn. Code Ann. § 39-11-504 (2003).

At trial, the defendant testified as to his claims of duress, and, as is obvious from the jurors' verdict, they did not accredit the testimony. Crediting the State's evidence, which we have set out, the jury reasonably could have found the defendant guilty of felony murder and especially aggravated robbery. Additionally, the jury reasonably could have disbelieved the defendant's claim that he had no choice but to participate in the robbery of the victim because he felt threatened by Ramirez and Serrano. Accordingly, we conclude that the evidence is sufficient to sustain the convictions.

## II. Denial of Motion to Suppress

The defendant next argues that the trial court erred in denying his motion to suppress his statement, saying without "his admission that Mr. Ramirez convinced him to help in the robbery, the State would have had no case." He claims that he was in police custody at the time he gave the statement and that he should have been advised of his Miranda rights. The trial court found to the contrary as to both claims.

We review the trial court's denial of the defendant's motion to suppress by the following well-established standard:

> Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence. So long as the greater weight of the evidence supports the trial court's findings, those findings shall be upheld. In other words, a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise.

State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). However, the trial court's application of law to the facts, as a matter of law, is reviewed *de novo*, with no presumption of correctness. State v. Daniel, 12 S.W.3d 420, 423 (Tenn. 2000). This court may consider the proof at trial, as well as at the suppression hearing, when considering the appropriateness of the trial court's ruling on a pretrial motion to suppress. See State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998) (holding that because the rules of appellate procedure "contemplate that allegations of error should be evaluated in light of the entire record," an appellate court "may consider the proof adduced both at the suppression hearing and at trial").

The defendant filed a pretrial motion to suppress his statements, arguing that the statements were not freely and voluntarily made and were obtained in violation of the Vienna Convention, the latter claim not being pursued on appeal. At the February 11, 2004, suppression hearing, Detective Baltimore testified that he interviewed the defendant through Detective Rivera, who translated in Spanish. He advised the defendant that he was not under arrest and told him the detectives "just

wanted to find out how they got the [victim's] truck." He said he told the defendant he was free to leave at any time. Detective Baltimore said the defendant was not arrested the day he gave his statement and was, in fact, not arrested until "months" later. On cross-examination, Detective Baltimore acknowledged he told the defendant that if Ramirez said the defendant had helped him, the defendant would be arrested and that if the defendant told the truth, he would be allowed "to walk out of here today." Asked why he made the latter statement to the defendant, Baltimore explained, "It was just a technique to try to get him to tell me what Serrano had done."

The defendant testified at the hearing that he had a third grade education and that he was not advised of his rights at the time he gave his statement. He said he was never informed that he did not have to talk to the detectives or that he had the right to talk to the Mexican Consulate.[2] Asked if he thought he was free to leave during the interview, the defendant replied, "I just didn't know, just told me to testify. I didn't know if I was going to be arrested. I didn't know what to do." He acknowledged that he went with the detectives to the crime scene after the interview but said it was his understanding that he had no choice but to accompany them. On cross-examination, the defendant acknowledged that he voluntarily returned to Tennessee from Pennsylvania after learning from Heather Aguirre that the police wanted to talk to him. He also acknowledged that, during the interview, the police never told him that he was under arrest. He said he had wanted to tell the police the truth but was afraid that Ramirez and Serrano "would do something" to him. Asked by the trial court if he knew what "advised of your rights" meant, the defendant replied, "I don't know."

At the conclusion of the hearing, the trial court took the motion under advisement and subsequently entered a detailed order denying it.

In concluding that the statement was voluntary, the trial court noted that Detective Baltimore testified that neither the defendant nor his codefendant, Serrano, was advised of his rights when questioned because neither was a suspect or under arrest and officers had no intention to do so, the purpose of the questioning being to determine how they came to possess the victim's vehicle. Additionally, Baltimore said that when the defendant and Serrano went to the crime scene for an additional interview, the two rode with Heather Aguirre, rather than in a police vehicle. To ascertain whether the defendant was in custody at the time of his interview with the officers, the trial court applied the nine-factor test set out by our supreme court in State v. Anderson, 937 S.W.2d 851, 855 (Tenn. 1996). These factors are: the time and location of the interrogation; the duration and character of the questioning; the officer's tone of voice and general demeanor; the suspect's method of transportation to the place of questioning; the number of police officers present; any limitation on movement or other form of restraint imposed on the suspect during the interrogation; any interactions between the officer and the suspect, including the words spoken by the officer to the suspect, and the suspect's verbal or nonverbal responses; the extent to which the suspect is confronted with the law enforcement officer's suspicions of guilt or evidence of guilt; and finally,

---

[2]At the beginning of the hearing, defense counsel informed the trial court that the defendant is not a United States citizen.

the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will. Id.

In applying these considerations, the trial court noted that the defendant had voluntarily come to the police station with a friend; that only two officers were present during the questioning, with Detective Rivera being present because he was fluent in Spanish and could interpret for the defendant; that the defendant was not placed in restraints during the interview; that the intent of the interview was to determine how the defendant came into possession of the victim's vehicle and he was not a suspect at the time; and that he was not arrested until July 9, 2003, nearly one year after the interview. Additionally, the court concluded in its order that, based on its review of the interview tape and of the transcript, "both the verbal and non-verbal interaction between the detectives and Defendant [was] a cordial exchange, free from threats." Although Detective Baltimore told the defendant during the interview that "if [Ramirez] says that you helped him . . . I'm gonna [sic] arrest you," Baltimore explained, during cross-examination, that he was using trickery with the defendant. The trial court noted that the courts of this state have permitted misrepresentations to be made to an individual being questioned so long as it "alone does not invalidate an otherwise voluntary confession." State v. Stearns, 620 S.W.2d 92, 96 (Tenn. Crim. App. 1981).

Based upon its review of the videotape and transcript of the interview, the court determined that the statements of Detective Baltimore to the defendant "did not rise to the level to overbear Defendant's will." Additionally, the trial court found, based upon the defendant's testimony at the suppression hearing, that he did not "feel threatened or coerced by the officers." At the hearing, the defendant testified that he was not told he was under arrest, when he appeared for the questioning, and that he understood the translation of Detective Rivera. Further, the defendant said that he was afraid of Serrano and Ramirez and not the detectives. Taking all of this together, the trial court concluded that the defendant "was not in custody and that his statements to the police during his September 3, 2002[,] interview were made voluntarily."

On appeal, the defendant makes several claims as to why the trial court erred in concluding that, at the time of making his statement, he was not in custody. He argues that "part of the beginning of the videotape [of the defendant's statement] is missing. The detectives have not been able to account for why the videotape was not turned on." Continuing this argument, the defendant asserts that "[i]t is simply too suspicious and convenient for the detectives to testify that the videotape was erroneously not turned on when [he] was told he could cease the questioning at any time." The defendant notes that he testified at the suppression hearing that he had a third grade education; that, at the time of the hearing, he did not know if he was free to leave the interview room; that he was shaking during the interview; and that he did not know he could cease answering questions if he wished.

In ruling on the defendant's motion to suppress, the trial court credited the testimony of Detective Baltimore as to the circumstances of the interview and its non-coercive nature, as well as verifying it from the videotape and the transcript, noting that even the defendant's testimony at the hearing did not support his claim that he reasonably believed he was under arrest at the time. The

testimony, as we have set out, supports this determination and finding, as well as the court's application of the <u>Anderson</u> factors.

We conclude that the record supports the determination of the trial court that the defendant was not in custody at the time he gave his statement, and, therefore, the officers were not required to advise him of his <u>Miranda</u> rights before questioning began.

### III.  Reading of Transcript of Defendant's Statement by Intern with District Attorney General's Office

The defendant argues that the trial court erred in allowing Harold Donnelly, an intern from the district attorney general's office, to participate in the reading of the transcript of his statement to the jury.  Specifically, he argues that the intern could not have portrayed the defendant's demeanor and body language at the time he gave his statement and that the reading of the transcript was "a needless presentation of cumulative evidence.  It's [sic] probative value was substantially outweighed by the realistic danger of unfair prejudice to [the defendant]."

At trial, the defendant's lengthy statement was read into evidence by Detectives Baltimore and Rivera and Donnelly.  Because the defendant could not testify in English, the trial court allowed the intern to participate in the reading of the statement.  After the statement was read, the trial court instructed the jury:

> [A] video tape-recording was allowed in evidence.  And you have been provided with a document certified to be an accurate transcription of the videotape.  This document was provided to you to assist in your understanding of the audio.
>
> The transcript was read to you by . . . Detective Baltimore and Detective Rivera, and an individual who's been identified to you as being – belonging to the district attorney's office.  The words identified – and he was reading the words identified as belonging to the defendant.
>
> If there were any discrepancies between the actual reading and the transcript that was certified to be accurate, you must rely upon the certified transcript.
>
> Also, this transcript contains statements that were made by Detectives Baltimore and Rivera.  These statements are not admitted for the truth of the matters asserted by Detectives Baltimore and Rivera.  These statements of these witnesses are admissible only as they provide meaning to the statements made by the individual identified as the defendant.  Only the statements made by the person you identify as the defendant may be considered by you on the question of whether the defendant is guilty or not guilty of any offense.

The State argues, and we agree, that the defendant has presented this argument based upon his view that the trial court should not have allowed the transcript to be read aloud but without citation to any authorities as to why this procedure is not within the discretion of the court as to presentation of evidence.

We respectfully disagree with the defendant's arguments as to this issue. First, it is sheer speculation to assert that the intern's "demeanor and body language" affected the trial. The defendant has not claimed that there was anything unusual about the intern's demeanor and body language as he read portions of the statement. Further, the defendant's arguments as to the prejudicial/probative considerations are not relevant for the sole issue as to this point was the manner of introduction of the evidence, not its admissibility. Accordingly, we conclude that even if the trial court erred in allowing the defendant's statement to be read aloud in the fashion which it was, the error was harmless.

### IV. Jury Instruction on Flight

At trial, the defendant testified that shortly after the crimes, he went to Pennsylvania with Ramirez and Serrano. He also testified that he went to Florida after learning that Serrano had been arrested. The defendant distinguishes the two occasions he left the state by arguing that the flight instruction was justified by his going to Florida but that, as to his trip to Pennsylvania, "there was overwhelming evidence that he was under duress." He argues that the trial court erred in instructing the jury on flight, saying "the jury might have confused the two times [the defendant] left the jurisdiction and thereby associate[d] the trial judge's flight charge with each time [the defendant] left Tennessee."

The trial court instructed the jury as to flight:

The flight of a person accused of a crime is a circumstance which, when considered with all the facts of the case, may justify an inference of guilt. Flight is the voluntary withdrawal of oneself for the purpose of evading arrest or prosecution for the crime charged. Whether the evidence presented proves beyond a reasonable doubt that the defendant fled is a question for your determination.

The law makes no precise distinction as to the manner or method of flight; it may be open, or it may be a hurried or a concealed departure, or it may be a concealment within the jurisdiction. However, it takes both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community, or a leaving of the community for parts unknown, to constitute flight.

If flight is proved, the fact of flight alone does not allow you to find that the defendant is guilty of the crime alleged. However, since flight by a defendant may be caused by a consciousness of guilt, you may consider the fact of flight, if flight is so proven, together with all of the other evidence when you decide the guilt or

-12-

innocence of the defendant. On the other hand, an entirely innocent person may take flight and such flight may be explained by proof offered, or by the facts and circumstances of the case.

Whether there was flight by the defendant, the reasons for it, and the weight to be given to it, are questions for you to determine.

The defendant does not claim the trial court gave an incorrect instruction as to flight, only that error occurred if the jury applied the instruction to both occasions when he left Tennessee. The jury was not required to accept the defendant's view that flight could not be considered as to the Pennsylvania trip because, by his view, it was taken under "duress." Thus, this argument is without merit.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE